DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**R.B.,** a child**,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D19-817

[April 29, 2020]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Luis Delgado, Judge; L.T. Case No. 502019CJ000032A.

Carey Haughwout, Public Defender, and Patrick B. Burke, Assistant Public Defender, West Palm Beach, for appellant.

Ashley Moody, Attorney General, Tallahassee, and Paul Patti, III, Assistant Attorney General, West Palm Beach, for appellee.

CONNER, J.

R.B. appeals his commitment to a high-risk residential program after the trial court departed from the restrictiveness level recommended by the Department of Juvenile Justice ("DJJ"). We agree with R.B.'s arguments that the trial court failed to comply with *E.A.R. v. State*, 4 So. 3d 614 (Fla. 2009), in deviating from the DJJ's recommendation for a nonsecure residential program. Accordingly, we affirm the commitment to a DJJ program, but reverse and remand for a new disposition hearing and an analysis that comports with *E.A.R.* if the trial court decides again to deviate from the recommendation of the DJJ as to the restrictiveness level for commitment.

*Background*

After waiving trial and entering pleas, R.B. proceeded to a disposition hearing on charges of burglary of a conveyance and trespass in a structure

or conveyance. Pending disposition, R.B. violated home detention and was arrested on new charges in a neighboring county.

The DJJ's predisposition report ("PDR") noted that R.B.'s risk to reoffend was high, he had not been attending school for a significant period, and he had never been committed to the DJJ before. R.B's father reported that: R.B. experimented with marijuana in the past but the father was unsure of his current usage; R.B. was diagnosed with attention deficit hyper-activity disorder ("ADHD") but was not taking his medication; and he was easily influenced by his friends. A multidisciplinary commitment staffing was held and a comprehensive evaluation was prepared in advance of the disposition hearing. However, the comprehensive evaluation report was not available at the time the PDR was completed. Nonetheless, the PDR recommended commitment to a nonsecure residential program.

The comprehensive evaluation noted that R.B. had a history of family instability, relocations, and exposure to violence. He was habitually truant and did not have a GPA, as he had not earned any high school credits. In the evaluation, R.B. admitted to a history of marijuana use and that he stopped taking his ADHD medication because he did not like the way it made him feel. Ultimately, the comprehensive evaluation determined that R.B. met the criteria for having a conduct disorder based on his history of arrests, truancy, and participation in thefts and fighting.

At the disposition hearing, the DJJ repeated its recommendation that R.B. be committed to a nonsecure residential facility. The State agreed. The defense recommended probation. In response to the defense arguments for probation, the State pointed out that at the commitment staffing, both R.B.'s mother and grandmother expressed that he should be in a program where he can effectively receive the services he needs; he was previously unsuccessfully terminated from probation; the comprehensive evaluation found he had a conduct disorder; he was a high risk to reoffend; and he had impulsivity issues, as shown by committing new crimes. The DJJ stated that it considered R.B.'s high risk to reoffend and his unsuccessful history with probation, but because he had never been committed, it determined that the nonsecure residential program would meet his needs.

The trial court ultimately decided against probation and committed R.B. to the DJJ. The trial court asked for recommendations as to the restrictiveness level for commitment, and all three parties recommended nonsecure residential. The trial court stated it was considering high-risk placement, mostly due to concerns about R.B.'s high risk for reoffending

2

and concerns about public safety. The trial court felt high-risk commitment was appropriate, reasoning:

> [T]his child is a danger to the community as was argued by the state, the comprehensive evaluation also mentions that, that there are concerns that he is—about his recidivism, and the positive achievement change tool does list his risk to reoffend as a high risk to reoffend, and so if he is a high risk to reoffend he does not represent a low or moderate risk to public safety, making him—or placing him in a non-secure residential facility inappropriate. High-risk residential differs in that youth assessed or—for this placement level require close supervision in a structured setting and placement is prompted by a concern for public safety that outweighs placement at a lower commitment level. Now if the concern for public safety is what is important and this child is a high risk to reoffend and there are incredible concerns regarding his recidivism, I believe that statutorily he would not be appropriately placed in a non-secure residential facility but instead in a high-risk residential facility. In addition to that the child is ungovernable—I did understand from mom and from dad that if he wants to go home that perhaps he should go home and listen, but this child does as he pleases. Previously he was sent to live with his mother and he returned to Miami the next day; this child is ungovernable and does as he pleases. He would rather be with his friends because he does as he pleases. The child is not in school; he is 17 years old and had zero credits because he does as he pleases. He's been diagnosed with ADHD and he's not on his medication, has not taken his medication for several years because he does as he pleases. This child is not governable.

Defense counsel attempted to change the trial court's mind by arguing that the crimes for which he was adjudicated for were all property crimes, and "[h]e's not violent, he's not a danger, not in a violent way; he may be a nuisance to the community but he's not a dangerous person to anybody." The trial court disagreed and committed R.B. to a high-risk facility. A written order explaining the reasons for deviating from the DJJ's recommendation for the restrictiveness level of commitment was not entered.

After disposition, R.B. gave notice of appeal.

3

*Appellate Analysis*

"A trial court's departure from the DJJ recommendation is reviewed for abuse of discretion. However, whether a juvenile court has employed the proper legal standard in providing its departure reasons is a question of law subject to de novo review." *D.R.R. v. State*, 94 So. 3d 680, 681 (Fla. 4th DCA 2012) (citations omitted).

Section 985.433, Florida Statutes, governs "[d]isposition hearings in delinquency cases." § 985.433, Fla. Stat. (2019). Subsection (6) provides that "[t]he first determination to be made by the court is a determination of the suitability or nonsuitability for adjudication and commitment of the child to the [DJJ]. This determination shall include consideration of the recommendations of the [DJJ], which may include a [PDR]." § 985.433(6), Fla. Stat. (2019). Subsection (7) then requires the determination to be in writing or on the hearing record and include specific findings for the reasons the court chose commitment. § 985.433(7), Fla. Stat. (2019).

In making a determination, "[t]he [DJJ] shall recommend to the court the most appropriate placement and treatment plan, specifically identifying the restrictiveness level most appropriate for the child if commitment is recommended." § 985.433(7)(a), Fla. Stat. Subsection 7(b) further provides:

> The court shall commit the child to the [DJJ] at the restrictiveness level identified or may order placement at a different restrictiveness level. The court shall state for the record the reasons that establish by a preponderance of the evidence why the court is disregarding the assessment of the child and the restrictiveness level recommended by the [DJJ].

§ 985.433(7)(b), Fla. Stat.

In *E.A.R.*, our supreme court held that under chapter 985, a juvenile court may only depart from the DJJ's recommended disposition if it:

> (1) Articulate[s] an understanding of the respective characteristics of the opposing restrictiveness levels *including* (but not limited to) the type of child that each restrictiveness level is designed to serve, the potential "lengths of stay" associated with each level, and the divergent treatment programs and services available to the juvenile at these levels; and

(2) Then logically and persuasively explain[s] why, in light of these differing characteristics, one level is better suited to serving both the rehabilitative needs of the juvenile—in the least restrictive setting—and maintaining the ability of the State to protect the public from further acts of delinquency.

*E.A.R.*, 4 So. 3d at 638.  The court further explained that:

> Simply listing "reasons" that are totally unconnected to this analysis does *not* explain why one restrictiveness level is better suited for providing the juvenile offender with "the *most appropriate* dispositional services in the *least restrictive* available setting."  § 985.03(21), Fla. Stat. (2007) (emphasis supplied); *see also* §§ 985.03(44)(a)–(e), 985.433(7)(a)-(b) Fla. Stat. (2007).  The failure to connect departure "reasons" to the juvenile court's ultimate statutory duty during a disposition hearing completely undermines the Legislature's carefully crafted statutory scheme.  These "reasons" must "establish by a preponderance of the evidence why the court is disregarding the assessment of the child *and* the restrictiveness level recommended by the [DJJ]."  § 985.433(7)(b), Fla. Stat. (2007) (emphasis supplied).

*Id.* (alteration in original).  Ultimately, the supreme court concluded that

> simply parroting is insufficient to justify departure and that, instead, the juvenile court's stated "reasons," must provide a legally sufficient foundation for "disregarding" the DJJ's professional assessment and PDR *by identifying significant information that the DJJ has overlooked, failed to sufficiently consider, or misconstrued with regard to the child's programmatic, rehabilitative needs along with the risks that the unrehabilitated child poses to the public.*

*Id.* (emphasis added).

   *E.A.R.*'s requirement for findings to justify deviation from the DJJ's recommendations for disposition "are unnecessary for the court's initial decision of whether to commit a juvenile even where the DJJ recommends probation" but rather, "apply only to the second step of the disposition process when a [trial] court departs from the recommended restrictiveness level of the commitment."  *D.R. v. State*, 178 So. 3d 478, 482 (Fla. 4th DCA 2015).  Additionally, "it is well settled that under the constraints of *E.A.R.*,

a trial court 'may not deviate simply because it disagrees with the disposition recommended by DJJ[.]'" *C.C. v. State*, 276 So. 3d 14, 18 (Fla. 4th DCA 2019) (quoting *B.L.R. v. State*, 74 So. 3d 173, 176 (Fla. 1st DCA 2011)).

We also note that section 985.03(44)(a)–(d), Florida Statutes (2019), provides for four restrictiveness levels for commitment: minimum-risk nonresidential, nonsecure residential, high-risk residential, and maximum-risk residential.

R.B. argues reversal is warranted under *E.A.R.* because:

> The trial judge did not articulate an understanding of the various restrictiveness levels and then logically and persuasively explain why the High-Risk Residential Program was better suited to serving both the rehabilitative needs of the juvenile, in the least restrictive setting, and maintaining the ability of the State to protect the public from further acts of delinquency.

Furthermore, R.B. argues that "the trial judge did not identify significant information that the DJJ overlooked, or that it failed to sufficiently consider, or misconstrued with regard to the child's programmatic, rehabilitative needs along with the risks that the unrehabilitated child poses to the public." We agree.

In the instant case, the trial court did not set forth a comprehensive and thorough basis for its departure from the DJJ's recommendation. The record clearly shows that the trial court was concerned that the PDR assessed R.B.'s risk to reoffend as high. Additionally, the trial court expressed concern that R.B. was ungovernable and "does as he pleases." In the view of the trial court, a high risk to reoffend meant that R.B. presented a public safety concern and "a danger to the community." Although the State argued at the disposition hearing, and the trial court agreed, that the comprehensive evaluation concluded that R.B. presented a concern for public safety, a review of the written evaluation does not support such an assertion. Nowhere in the evaluation is the term "public safety" used. Nor does the evaluation support the conclusion stated by the trial court that R.B. was a danger to the community.

Reversal is also required in part because the trial court failed to "[a]rticulate an understanding of the respective characteristics of the opposing restrictiveness levels." *E.A.R.*, 4 So. 3d at 638. Although the trial court recited certain distinctions between nonsecure residential

commitment programs and high-risk residential programs identified in section 985.03(44), the trial court's discussion was simply the "parroting" of statutory phrasing that was disapproved in *E.A.R.* In discussing the distinctions, what seemed most important to the trial court was the assessment that R.B. was evaluated to have a high risk to reoffend, making him a high risk in terms of public safety. By equating high risk to reoffend with being "a danger to the community," the trial court concluded that "statutorily [R.B.] would not be appropriately placed in a non-secure residential facility but instead in a high-risk residential facility." Notably, at no point during the disposition hearing did the trial court elicit information as to the different treatment programs or services offered either at the nonsecure or high-risk facilities to support the analysis.

The trial court also failed to meet the second prong of the *E.A.R.* test. Specifically, the trial court failed to justify the departure vis-à-vis the needs of the child. *See J.H. v. State*, 100 So. 3d 1236, 1238 (Fla. 2d DCA 2012) ("[T]he 'needs of the child' must be the focal point for the court when it is assessing where along the restrictiveness spectrum a child should be placed." (alteration in original) (quoting *N.P. v. State*, 18 So. 3d 735, 737 (Fla. 2d DCA 2009))); *S.G. v. State*, 26 So. 3d 725, 726 (Fla. 2d DCA 2010) ("The court is required to discuss the restrictiveness level vis-à-vis the needs of the child."). Instead, here, the trial court simply focused on "maintaining the ability of the State to protect the public from further acts of delinquency" but failed to mention a single time how high-risk commitment was "better suited to serving . . . the rehabilitative needs of the juvenile . . . in the least restrictive setting." *E.A.R.*, 4 So. 3d at 638. Specifically, the trial court noted that "placement in a high-risk facility is more appropriate because it is guaranteed to be hardware secure." While protecting the public is a significant factor to consider when departing from the DJJ's recommendation, it must be balanced with the rehabilitative needs of the child in the least restrictive setting. *See J.H.*, 100 So. 3d at 1238 (reversing the disposition order because "[t]he trial court did not explain adequately how a high-risk level of restrictiveness would better fit [the juvenile's] rehabilitative needs and public safety than a moderate-risk level of restrictiveness"); *D.R.R.*, 94 So. 3d at 682–83 (same). Similar to the situation presented in *M.H. v. State*, 69 So. 3d 325 (Fla. 1st DCA 2011), "the trial court reversibly erred by failing to state the deviation and placement in a moderate-risk facility was the least-restrictive setting necessary to protect the public from recidivism, while balancing the need for rehabilitation." *Id.* at 328.

Finally, we conclude that the trial court did not illustrate that the DJJ "failed to sufficiently consider, or misconstrued [facts] with regard to the child's programmatic, rehabilitative needs along with the risks that the

unrehabilitated child poses to the public." *C.C.*, 276 So. 3d at 18 (quoting *E.A.R.*, 4 So. 3d at 634). Instead, the record shows that all the information the trial court relied upon to decide what restrictiveness level was appropriate was already considered in the PDR and the comprehensive evaluation. There were no new facts established at the disposition hearing. Yet, for some unarticulated reason, the trial court determined that the risk to public safety was so significant that it outweighed placement in programs at a lower commitment level.

We remind delinquency court judges that

> deviating from a DJJ's recommendation is a difficult matter pursuant to the dictates of *E.A.R.* In order to deviate lawfully, a trial court must do more than place generalized reasons on the record; it must engage in a well-reasoned and complete analysis of the PDR and the type of facility to which the trial court intends to send the child. This is no easy task and will take time and consideration.

*M.H.*, 69 So. 3d at 328.

For the reasons explained above, we affirm R.B.'s commitment to the DJJ, but reverse the disposition order as to the restrictiveness level and "remand for a new disposition hearing with an updated pre-disposition report and the presentation of any new evidence and arguments by the parties." *C.C.*, 276 So. 3d at 19. "On remand, the trial court may amend the disposition order to include findings required by *E.A.R.* to support a high-risk commitment placement, or, if the court cannot make such findings, then the court must enter an order committing [R.B.] to a non-secure [residential] program as the DJJ recommended." *Id.*

*Affirmed in part; reversed in part, and remanded.*

FORST, J., and GILLESPIE, KENNETH, Associate Judge, concur.

\*     \*     \*

**Not final until disposition of timely filed motion for rehearing.**

8